**LUMBERMEN'S MUT. CASUALTY CO. v. VAUGHN.**

No. 14560.

Court of Civil Appeals of Texas. Fort Worth.

Oct. 22, 1943.

King, Dawson & Jones, of Wichita Falls, and Robertson, Leachman, Payne, Gardere & Lancaster and Henry D. Akin, all of Dallas, for appellant.

Napier & Napier, of Wichita Falls, for appellee.

McDONALD, Chief Justice.

This is a workmen's compensation case. The compensation carrier appeals from a judgment awarding compensation, rendered upon verdict of the jury.

The employee was Virgil Vaughn, who was fifteen years of age at the time of the accident. His mother is the plaintiff. On July 30, 1941, Virgil was employed at Sheppard Field, near Wichita Falls, as a water boy. While working above the ceiling of a building under construction, he fell through the ceiling to the floor below, a distance of twelve feet. It is undisputed that the immediate cause of his death was an attack of poliomyelitis, commonly called infantile paralysis, which caused a failure of his respiratory system. Plaintiff's case is built upon the theory, to quote from a counter-point in her brief, "that the evidence abundantly shows a physical injury to the brain and spinal cord, and that such injury opened a way for the invasion of a virus which produced the terminal disease".

The jury found, in response to the fourth special issue, that the injury sustained on July 30th was a "producing cause" of Virgil's death. Under its first point of error appellant contends that its motion for instructed verdict should have been granted, and under its second point that judgment should have been rendered for it upon its motion for judgment non obstante. The statements and arguments under the two points present the legal question of whether there is any evidence of probative force which supports the answer of the jury to the fourth special issue.

Considering only the evidence which tends to support the verdict, and the reasonable inferences which may be drawn from such evidence, and discarding the evidence to the contrary, we think that it may fairly be said: Virgil fell a distance of twelve feet. He landed on the floor below either in a sitting position or he fell to a sitting position immediately after landing on the floor. He declared at the time that he was not hurt. He told his mother that the fall did not hurt him and made the same statement in the presence of the family physician some two weeks later. He complained to a neighbor of pains in his head and back, and appeared to her to be nervous. The neighbor noticed a change in his appearance from and after the accident, and said that his condition appeared to grow worse from the day of the

accident to the time of his death. He worked the remainder of the day after the accident, and for about two weeks after that he either worked or sought employment. Before the accident Virgil was healthy and able-bodied, and was not nervous, but after he fell his mother noticed that he was more quiet, that he sat around, that he didn't want to do anything, that he would say, "I had rather not do it, mother", when she would ask him to do things for her. She noticed a change in his nervous condition after the accident, and that the change was more marked toward the last—during the four or five days immediately preceding his death. He lost weight and was getting pale. Virgil wasn't the type that would complain much. He told his mother about his buttocks being sore. Starting Thursday (before his death on Monday), Virgil began getting worse. On Friday evening when his mother came home he told her that he wasn't feeling well and that he had vomited and he didn't want any supper. She then took him to the doctor, who thumped around on Virgil a little bit and said that he had intestinal flu. She told the doctor that Virgil had said that something was wrong with his throat, but the doctor replied that there was nothing wrong with his throat. The doctor told her to get some medicine. She took Virgil home, and on Saturday night he started vomiting. On Sunday Mrs. Vaughn tried to get in touch with the doctor but couldn't get him, so she took Virgil to another doctor at the same clinic. The latter doctor examined Virgil's vocal cords, and told Mrs. Vaughn to watch his voice closely, and to report to the doctor if the voice got worse during the night. When she saw Virgil at five-thirty on Monday morning he told her that he could not swallow at all. During the morning she took him back to the clinic (or hospital, as the institution was sometimes called by the witnesses). Dr. Parker, who had first examined Virgil, and who seemed to be the family physician, examined Virgil, and called Dr. Nelson in for consultation. They recommended a spinal puncture, but both Virgil and his mother refused to consent to the procedure. The substance of the conversation between the doctor and Mrs. Vaughn was that Virgil should be placed in the hospital, that she did not have the money for that, that the doctor then recommended that he be taken to "General", which we infer must have been a charity hospital. This was shortly before noon of the day on which Virgil died. She then took Virgil to her pastor, who took them to Dr. Rodda, a chiropractor. Dr. Rodda gave him an "adjustment", after which Mrs. Vaughn took the boy home. The boy then, in Mrs. Vaughn's words, "was choking to death". She ran and called Dr. Rodda, who said that he was too far gone and told her to call a medical doctor "to use a pump". She then took Virgil back to the clinic. Dr. Parker was not there, but three other doctors at the clinic examined Virgil and undertook to administer treatment. He died at two-twenty in the afternoon.

The medical witnesses were Drs. Caskey, Parker, Smith and Crump. Dr. Caskey appeared for plaintiff, the others appeared for defendant.

Dr. Caskey had never seen Virgil, and testified in answer to hypothetical questions. The hypothesis first submitted to him was somewhat as follows: Virgil fell, as has already been described. He made complaints substantially as has been stated above in the opinion. A couple of days before he died he began to complain of his throat. The condition became worse. He died about two days after the acute condition set in. Nothing was contained in the question concerning poliomyelitis, or concerning the findings resulting from the autopsy, which we shall discuss later. After such facts were recited, the doctor was asked to state whether or not, in his opinion, the injury contributed materially to the boy's death. His answer was, "I would say that it did." Plaintiff's counsel then said, "You may say why you say that, doctor", whereupon the witness stated: "For this reason: It appears that this man had a fall, which, as described, to my mind would be sufficient to injure his nervous system, more especially the brain than the brain stem and spinal cord. It would be sufficient to injure those parts of the nervous system. I believe it is agreed by authorities that an injury to any part of the body included in the nervous system, predisposes the body to diseases that may follow and that an injury predisposes the body to infection that may follow this injury. From what I understand of the circumstances as recited here, this man choked to death, presumably due to a paralysis of his throat and possibly his chest. Such paralysis can be accounted for, in fact, you might say is always accounted for, by paralysis of the nerves that

supply the throat and chest. The nerves that supply the throat and lungs come off or branch off from the brain—they are called Cranial Nerves, and they branch off from the brain. It is what is known as the sensorial portion, forming the lower part of the brain. From that basis it seems logical that this shake up and injury which he could well have had from the fall, would have so reduced the resistance of the nervous system that infection could very easily follow."

Although no specific mention was made of poliomyelitis upon the direct examination of Dr. Caskey, he was questioned at length concerning the disease upon cross-examination. Dr. Caskey testified that an injury, or trauma, could not be the inciting cause of the infection, but said, "I said an injury would predispose the body to infection and I believe that this particular fall would predispose the boy to infection, yes." He further said, "I don't lay any emphasis at all on the skinned elbow. I didn't think that was much a part of it. It was the jar, the crash of the fall which produced the injury that took place within his body. The skinned elbow was incidental." He also said, "I said it is my opinion that the fall as described in Court this morning predisposed this man to the condition which led to his death." Immediately after the above statement was made, the witness was asked, "Well, now you say it predisposed him to the condition—do you know what he died of?" The witness answered, "No, I don't know what he died of." Later in the cross-examination the following questions were asked and answered by Dr. Caskey as shown.

"Q. I haven't asked you yet—wait a minute, let me ask you the question. Assuming that he died of poliomyelitis or infantile paralysis, you wouldn't say that the mere fact he fell and hit on his feet and his arm, that distance would probably produce the virus at all—it couldn't? A. Of course not—that does not produce the germ.

"Q. You say that on that date, assuming still that he got poliomyelitis—all you would say that it predisposed him. A. That is my testimony.

"Q. In other words, you say it weakened his resistance in general until the germs took to it? A. That is what I testified to in regard to it."

As has been said, the witness' theory was that the fall was sufficient to injure the brain or the spinal cord. He was asked, "If he fell and injured his spinal cord, what part of the spinal cord would he have injured?" He replied, "He might have injured any part of it." Later, the witness said, "The cord or the brain, any one or more parts might have been injured by the fall." Referring again to the trauma, the witness said, "I stated here, that it is my opinion that trauma predisposes and did predispose in this case, and I believe I can cite you medical literature to that effect. I can cite you the book if you want it."

At the end of the cross-examination the witness was asked, "You cannot say that without that reduction of resistance that he might not have had it anyway, can you?" The witness replied, "He might have."

Further testifying, Dr. Caskey said that the distribution of the virus is widely spread, that there are many people who are called carriers who, themselves, do not have the disease, and that there are others who have mild attacks of the disease without developing any paralysis from it. He again declared that the fall did not give him the virus, but that, "when the resistance of a given part of the body is reduced by injury, that opens the gate for infection and of course that is what followed in this case."

Dr. Parker appeared as a witness for defendant. He testified that he delivered Virgil when he was born, and had seen him from time to time. As has been said, Mrs. Vaughn took Virgil to Dr. Parker when he first complained of being ill. He testified that he told Mrs. Vaughn on Monday, the day Virgil died, that he was in a serious condition, that he should have a spinal puncture, and that he should be put in a hospital. He told her that he would help get Virgil into the General Hospital. She said that she did not want to put him in the General Hospital, and thought she could raise the money and wanted to know how much would be required. Dr. Parker testified that he tried to impress upon her that Virgil ought to be put in the hospital right then, and that she didn't have to take Virgil with her to get the money. She didn't want to have the spinal puncture made. She took him away, as we have said earlier in the opinion. Dr. Parker was not at the clinic when Mrs. Vaughn returned with Virgil. When Dr. Parker ar-

rived Virgil was dead. Mrs. Vaughn consented to an autopsy.

When Dr. Parker examined Virgil on Monday, in the forenoon, he decided that Virgil was suffering from poliomyelitis. He died because his breathing facilities would not function. Dr. Parker testified that he did not see that the fall had the slightest connection with the infantile paralysis. He, like Dr. Caskey, testified that an injury would not produce the virus.

Dr. P. K. Smith testified for the defendant, saying that he also was connected with the clinic which has been mentioned. He particularly practices in internal medicine and diagnosis. He saw the autopsy report and went over it with Dr. Crump. He examined portions of the body in connection with the autopsy. He described in considerable detail the disease of poliomyelitis, its symptoms and causes. He said that for each case of poliomyelitis diagnosed as such in a community, most authorities think that there are twenty going undiagnosed— the individuals thinking that they have a little cold or sore throat, and soon get over it. Only thirty-five to forty percent ever show paralysis with the disease. The virus is an ultramicroscopic organism which cannot be seen with a miscroscope, although the witness understands that "they are getting" a miscroscope through which the virus can be seen. (Dr. Caskey also had heard of the virus being seen through an ultramicroscope, but had not himself seen it). The mode of transmission of the virus is argued about, but practically all authorities agree that it is through contact with fly-borne infection. The disease enters mostly through the nose and throat. The organism has a peculiar affinity for the cells in the spinal region, the ganglion cells, which supply the lower muscles. When these cells have become invaded by the organism, the cells become, from a microscopic point of view, injured cells. These cells swell and then disappear. It is not known why the virus attacks the spinal cord. About ten per cent of the time the virus involves the cells at the base of the brain, in the area where are located the cells which have to do with the muscles about the face and throat. If the virus involves that particular area, paralysis will appear. Dr. Smith looked at the sections of the spinal cord (taken in connection with the autopsy) and medulla, and around these ganglion cells was evidence of inflammation. A number of the cells had disappeared, and there was marked swelling. Although the virus cannot be seen, it leaves evidence of its presence which can be seen. As Dr. Smith put it, it leaves its tracks. The sections which Dr. Smith examined were, he said, typical of all infantile paralysis victims. The cells in question were located at the upper part of the spinal cord—the medulla. There is where are located the cells which control the throat. Dr. Smith believed that Virgil died of infantile paralysis, and it was his opinion that it could not have been caused or contributed to by any trauma. His opinions were based upon the microscopic examinations he made, and upon the hypothetical questions asked, which included in them the report of the autopsy.

Dr. Crump testified that he examined Virgil on Sunday morning, and then thought that he had a type of influenza. Dr. Crump performed the autopsy. He said that there was no definite diagnosis that could be made from the examination of the brain at the autopsy table. But from the microscopic examination made of sections taken from the base of the brain, the diagnosis was poliomyelitis, bulbar type. He said that there was no evidence from the autopsy and the pathologist's report to show that the death was contributed to by any trauma of any kind. He was asked, "Taking the whole history of the case, together with your autopsy and the pathologist's report, was it because of a trauma that the child died?" He answered, "No, it was from infantile paralysis."

Dr. Caskey was recalled to the stand. His testimony is somewhat confusing to us. He examined the autopsy report, and seemingly sought to interpret it in the light of an excerpt from a certain medical authority. His conclusion is perhaps contained in the following statement from his testimony. "As related to the statement here about hemorrhages, in this report they refer to the perivascular around the cells, which may show injury, so the two statements seem to be in line, particularly in line with my testimony this morning, that I felt like the infection was imposed upon him by the injury."

To sum up, what do we have in the way of evidence upon the question of whether the injuries received in the fall were a producing cause of the death? We have the testimony of Mrs. Vaughn and of the neighbor, which at most shows that Virgil made some complaint of pain in his back

and head, and that he appeared to be different after the accident. We doubt if this testimony proves anything with reference to the cause of the poliomyelitis infection. The doctors who examined Virgil before he died and who conducted the examination pertaining to the autopsy were all of the opinion that the death was caused by poliomyelitis, and that the fall had nothing to do with it. They found no evidence of traumatic injury. Dr. Caskey did not see Virgil before he died, and had no personal knowledge of the case. In the hypothetical question first submitted to him, no mention was made of poliomyelitis. He agrees with the doctors that the infection was not produced in the first instance by an injury. The most that can be made of his testimony is that the fall was sufficient to produce an injury to some part of the spinal cord or the brain, he never attempts to say what part, and that such injured portion was susceptible to the infection. He considers that the injury "predisposed" him to the disease. He cannot say whether Virgil would have had the disease if the fall had not occurred.

■ If plaintiff's theory is that Virgil's resistance to the infection was lowered by the accident—that he would have been able to throw off the infection but for the injuries received in the accident, whatever those injuries may have been—then it must fail for two reasons. First, when death is due directly to an intervening agency, having no connection with or relation to the original injury, although the injury may have to some extent reduced the power of resistance of the deceased, and in that manner contributed in some degree to his death, there is no liability for compensation. Texas Emp. Ins. Ass'n v. Burnett, 129 Tex. 407, 105 S.W.2d 200; Amann v. Republic Underwriters, Tex.Civ.App., 100 S.W.2d 778; Sparrow v. Safety Casualty Co., Tex.Civ.App., 114 S.W.2d 615, writ of error refused; Texas Pac. Fid. & Surety Co. v. Hall, Tex.Civ.App., 101 S.W.2d 1050, writ of error dismissed; Traders & General Ins. Co. v. Keahey, Tex.Civ.App., 119 S.W.2d 618, writ of error dismissed. Second, Dr. Caskey testified, and we do not see how he could have done otherwise, that he could not say that without the reduction of resistance Virgil would not have had the disease anyhow. Granted, for the sake of argument, that Virgil suffered an injury to his spinal cord at the place where the infection struck, it would be the sheerest speculation to say that he would not have the disease without the injury. All of the doctors, including Dr. Caskey, said that they did not know of any case, either from personal knowledge or from study of medical literature, in which a victim had suffered poliomyelitis following an injury of the kind described in the present case.

■ Plaintiff's theory that Virgil suffered an injury in the fall which, to use the language of plaintiff's brief, "opened a way for the invasion of a virus", cannot be supported for still another reason. It involves the piling of one inference upon another inference. Dr. Caskey was not able to say from his knowledge of the patient, or from the other evidence upon which were based the hypothetical questions put to him, that Virgil actually suffered an injury to the spinal cord or the brain at the spot where the infection made its attack, except by inferring that such an injury could have so happened. There being no direct evidence of such an injury, the injury can be established only by inference. There is no direct evidence that the injury, so established, made possible an infection which would not nevertheless have come about. Causation is not established merely by showing that the infection followed the injury in point of time. It is not enough merely to show that the fall was sufficient to have caused an injury, and that such an injury could have made possible the damaging effects of the infection. A case cannot be established by piling one presumption, or inference, upon another presumption, or inference. Federal Underwriters Exchange v. Hightower, Tex.Civ. App., 161 S.W.2d 338, writ of error refused, and authorities there cited.

■ In testing the sufficiency of circumstantial evidence, we must apply the rule thus stated in 17 Tex.Jur. 908: "To establish a fact by circumstantial evidence, the circumstances relied on must have probative force sufficient to constitute the basis of a legal inference; it is not enough that they raise a mere surmise or suspicion of the existence of the fact or permit of a purely speculative conclusion. The circumstances relied on must be of such a character as to be reasonably satisfactory and convincing, or, as it has been said, sufficient reasonably to produce belief of the existence of the fact which is sought to be shown by them. At all events they must not be equally consistent with the nonexistence of the ultimate fact."

The case is a tragic one. The short length of time between the accident and death has called for an especially careful study of the evidence. It is not unnatural that the plaintiff in this case should feel that there was a causal connection between the injury and the death of her son. But the controlling questions presented are within the realm of scientific knowledge, and beyond the experiences of the lay witness. It is admitted by all of the doctors that an injury does not produce this infection. It strikes with little or no warning. If certain cells are affected, paralysis will result, and if the paralysis affects certain vital organs or muscles, death will quickly follow. The burden was upon plaintiff to establish the causal connection between injury and death, and this she has undertaken to do by inferring injury from the fall, by inferring "predisposition" to infection from the injury thus inferred, and by further inferring that without the injury the infection would not have fatally affected the victim. We must hold that the burden cast by law upon the plaintiff has not been met, and that judgment should have been rendered in the court below in favor of defendant.

In view of our holding, it becomes unnecessary to consider the other points of error.

The judgment of the trial court is reversed, and judgment is here rendered in favor of defendant.